1

2

3

4

5

6

7

8

9          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
10                  AT TACOMA

11

12   RONALD KEAL *et al.* ,

13          Plaintiffs,

                                              Case No. C05-5737RJB
14          v.

                                              REPORT AND
15   THE STATE OF WASHINGTON, *et al.*,       RECOMMENDATION

16          Defendants.                       **NOTED FOR:**
                                              **February 23, 2007**
17

18

19          This 42 U.S.C. § 1983 Civil Rights action has been referred to the undersigned Magistrate Judge

20   pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR

21   3, and MJR 4. Before the court is a motion for summary judgment filed by the remaining thirty-eight

22   defendants. (Dkt. # 204).  Plaintiff has responded (Dkt. # 219).  Defendants choose not to reply.  The

23   motion is ripe for review.

24                          PROCEDURAL HISTORY

25          This action was filed in November of 2005 (Dkt. # 1).  The original proposed complaint was

26   deficient and plaintiff was instructed to file an amended complaint (Dkt. # 6).  On January 6, 2006, an

27

28   REPORT AND RECOMMENDATION - 1

1  amended complaint was filed (Dkt. # 8).  In May and June of 2006 defendants filed two motions to

2  dismiss and a motion for judgment on the pleadings (Dkt. # 134, 137, and 139).  Reports and

3  Recommendations to grant in part and deny in part the motions were entered and adopted.  The Report

4  and Recommendation, and order, germane to the thirty-eight remaining defendants now before the court

5  are (Dkt. # 162, and 176).  Plaintiff was instructed to file a second amended complaint curing certain

6  defects but was instructed to file no new claims and to add no new defendants.

7       Plaintiff filed a second amended complaint (Dkt. # 183).  Defendants then moved for summary

8  judgment.  The second amended complaint covers a large time span and multiple events. For the sake of

9  clarity facts will be set forth under the argument relating to each defendant or claim.

10                                      THE STANDARD OF REVIEW.

11       Pursuant to Fed. R. Civ. P. 56 (c), the court may grant summary judgment "if the pleadings,

12  depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that

13  there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

14  law." Fed. R. Civ. P. 56 (c).  The moving party is entitled to judgment as a matter of law when the

15  nonmoving party fails to make a sufficient showing on an essential element of a claim on which the

16  nonmoving party has the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1985).

17       There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a

18  rational trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Corp. v. Zenith Radio

19  Corp., 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence,

20  not simply "some metaphysical doubt").  See also Fed. R. Civ. P. 56 (e).  Conversely, a genuine dispute

21  over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring

22  a judge or jury to resolve the differing versions of the truth.  Anderson v. Liberty Lobby, Inc., 477 U.S.

23  242, 253 (1986); T. W. Elec. Service Inc. v. Pacific Electrical Contractors Association, 809 F.2d 626,

24  630 (9th Cir. 1987).

25       The determination of the existence of a material fact is often a close question.  The court must

26  consider the substantive evidentiary burden that the nonmoving party must meet at trial, e.g., the

27  preponderance of the evidence in most civil cases.  Anderson, 477 U.S. at 254; T.W. Elec. Service Inc.,

28  REPORT AND RECOMMENDATION - 2

1   809 F.2d at 630.  The court must resolve any factual dispute or controversy in favor of the nonmoving

2   party only when the facts specifically attested by the party contradicts facts specifically attested by the

3   moving party. Id.

4          The nonmoving party may not merely state that it will discredit the moving party's evidence at

5   trial, in hopes that evidence can be developed at trial to support the claim.  T.W. Elec. Service Inc., 809

6   F.2d at 630. (relying on Anderson, supra).  Conclusory, nonspecific statements in affidavits are not

7   sufficient, and "missing facts" will not be "presumed."   Lujan v. National Wildlife Federation, 497 U.S.

8   871, 888-89 (1990).

9                                              DISCUSSION.

10         A.      Use of force on February 2, 2004.

11         On February 2, 2004, Mr. Keal was being housed at the Washington State Penitentiary in

12  Walla Walla.  It is undisputed that while in the "Big Yard" Mr. Keal was involved in a fight with

13  another inmate.  Officers ordered the inmates to stop fighting and lie on the ground.  The fight

14  stopped and the other inmate complied with the order to lie on the ground.  Mr. Keal admits he did

15  not lie on the ground but instead got to one knee and turned his back on the officers.

16         Correctional Officer Abbott used force to place Mr. Keal on the ground.  The parties

17  disagree on the amount of force used.  Correctional Officer Abbott and the other defendants maintain

18  an arm bar hold was used to take Mr. Keal to the ground (Dkt. # 204, page 10).  Mr. Keal alleges he

19  was "tackled" by Officer Abbott.  Mr. Keal alleges he heard his hip pop as he went to the ground

20  (Dkt. # 219, page 9).  The disagreement regarding the amount of force used is immaterial to the

21  court's analysis.

22         The use of excessive force by a correctional officer states a valid claim under 42 U.S.C. §

23  1983.  The threshold inquiry for such a claim is whether the force was applied in a good faith effort

24  to maintain or restore discipline, or maliciously and sadistically to cause harm.  Hudson v. McMillian,

25  503 U.S. 1 (1992).  Wilson v. Seiter, 501 U.S. 294 (1991).  The reasonableness inquiry in an

26  excessive force case is an objective one: the question is whether the officers' actions are objectively

27  reasonable in light of the facts and circumstances confronting them, without regard to their

28  REPORT AND RECOMMENDATION - 3

1   underlying intent or motivation. <u>Graham v. Connor</u>, 490 U .S. 386, 397 (1989).

2          Here, correctional officers intervened to stop a fight.  It is undisputed that both inmates were

3   ordered to lie on the ground.  Mr. Keal disobeyed that order and force was used to make him

4   comply.  The order to lie down, so officers can safely approach an inmate to apply physical restraints

5   after a fight, furthers legitimate goals of safety and helps restore order.  For Mr. Keal to argue he had

6   any right to disobey the order to lie down is disingenuous.

7          In reaching this conclusion, the court relies heavily on a 1986 Supreme Court case. <u>Whitley</u>

8   <u>v. Albers</u>, 475 U. S. 312 (1986).  In <u>Whitley</u> an inmate was shot by prison officials.  The prison

9   officials had just entered a cell block and the officers were told to shoot any inmate who tried to go

10  up the stairs to the top tier.  Prison officials believed a hostage was being held on the top tier.  The

11  court in <u>Whitley</u> stated:

12          It is obduracy and wantonness, not inadvertence or error in good faith, that
           characterizes the conduct prohibited by the Cruel and Unusual Punishments Clause,
13         whether that conduct occurs in connection with establishing conditions of
           confinement, supplying medical needs, or restoring official control over a tumultuous
14         cellblock.  The infliction of pain in the course of a prison security measure, therefore,
           does not amount to cruel and unusual punishment simply because it may appear in
15         retrospect that the degree of force authorized or applied for security purposes was
           unreasonable, and hence unnecessary in the strict sense.
16
17  <u>Whitley v. Albers</u>, 475 U. S. 312, 319 (1986).  Here, prison officials were restoring order after a

18  fight.  Using force to place Mr. Keal on the ground did not violate any right or duty owed him under

19  these circumstances.  **Defendant Abbott's motion for summary judgement should be**

    **GRANTED**.

20
21         B.      <u>Claims against defendants Rima, Hartford, Richard Morgan, Sharon Morgan, Carter,</u>

                   <u>Clarke, Vail, and Mason.</u>
22
23         Defendants argue the Order adopting the Report and Recommendation regarding these eight

24  defendants at the 12 (c) stage, (Dkt. # 176), entitles them to dismissal because plaintiff has failed to

25  state a viable claim against them.  The court originally entered a Report and Recommendation to

26  dismiss these defendants because they were being sued under the theory of *respondeat superior*

27  (Dkt. # 162).  The claims in the second amended complaint against each of these defendants must

28  REPORT AND RECOMMENDATION - 4

1   again be examined.

2       1.   Patricia Rima.

3       The allegations against Ms. Rima are contained in paragraph 4.11 of the second amended

4   complaint (Dkt. # 183 page 13).  Plaintiffs allege Ms. Rima is responsible for administration and

5   oversight of medical personnel at the Washington State Penitentiary.  Plaintiffs allege Ms Rima

6   investigated at least two grievances filed by Mr. Keal.  Mr. Keal alleges one of these grievances was

7   an emergency grievance for medical attention filed when Mr. Keal arrived at the penitentiary on

8   November 20, 2003.  Defendants allege there was no emergency grievance for medical care and

9   provide records showing medical "intake" and screening on November 20, 2003 (Dkt. 204-10, page

10  6).  Further, the record shows plaintiff was seen and evaluated on November 26, 2003 for complaints

11  of neck and back pain (Dkt. # 204-10, page6).  Thus, plaintiff fails to establish this defendant played

12  any role in denying medical services to plaintiff.  Plaintiff Keal also alleges Ms. Rima failed to

13  transfer him for medical treatment but does not indicate what treatment was needed or that failure to

14  transfer him amounted to cruel and unusual punishment under the Eighth Amendment (Dkt. # 183,

15  page 13).

16      There is no allegation that defendant Rima provides medical treatment herself.  She is sued

17  for her role as a supervisor and for her response to grievances. A plaintiff must set forth the specific

18  factual bases upon which he claims each defendant is liable.  Aldabe v. Aldabe, 616 F.2d 1089, 1092

19  (9th Cir. 1980).  A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of

20  supervisory responsibility or position.  Monell v. New York City Dept. of Social Services, 436 U.S.

21  658, 694 n.58 (1978).  A theory of *respondeat superior* is not sufficient to state a claim under 42

22  U.S.C. § 1983.  Padway v. Palches, 665 F.2d 965 (9th Cir. 1982). Medical treatment claims against

23  this defendant fail as she cannot be sued based on her supervisor position.

24      Claims based on Mr. Keal's use of the grievance system also fail.  The United States

25  Constitution does not mandate that prison officials allow the filing of grievances or that a prison has a

26  grievance system.  Mann v. Adams, 855 F.2d 639 (9th Cir. 1988)  There is no allegation that this

27  defendant ever participated in any alleged unconstitutional activity.  Plaintiff has no constitutional

28  REPORT AND RECOMMENDATION - 5

1  right to a grievance process and cannot demand or expect responses to grievances that are to his

2  satisfaction.

3  Claims relating to failure to transfer the plaintiff for medical treatment fail.  Plaintiff has failed

4  to come forward with any evidence to show a transfer was ordered by any medical provider.  Plaintiff

5  also fails to provide any competent evidence showing a transfer was medically necessary.  In

6  addition, this was not a claim in the first amended complaint (Dkt. # 8).  The order allowing

7  amendment to cure defects specifically informed plaintiff he was not to raise any new issues (Dkt #

8  176).  **Defendant Rima's motion for summary judgment should** be **GRANTED.**

9  2.  Sherry Hartford.

10  The allegations against defendant Hartford are contained in paragraph 4.7 of the second

11  amended complaint (Dkt. # 183, page 11).  Plaintiff Keal alleges Ms. Hartford is responsible for

12  coordinating and supervising religious dispute resolution.  Plaintiff claims he was denied the right to

13  pray with others and denied a Halal Diet.  Plaintiff does not show that defendant Hartford played any

14  part in these decisions.  She is sued for her role as a supervisor and for her response to grievances or

15  appeals.  This defendant is entitled to summary judgment for the same reasons as defendant Rima.

16  **Defendant Hartford's motion for summary judgment should be GRANTED.**

17  3.  Richard Morgan.

18  The claims against Richard Morgan are contained in Paragraph 4.6 of the second amended

19  complaint.  Mr. Keal alleges Mr. Morgan is responsible for institutional safety and welfare, religious

20  disputes, and appeals involving religion.  Defendants argue:

21  Plaintiffs have failed to state a viable claim against Mr. Morgan, and therefore the
claims against him must be dismissed. Plaintiffs allege that Mr. Morgan is responsible
22  for the institution and that he was "made aware" of the religious issues raised by Mr.
Keal in grievances and letters. Mr. Morgan cannot be held liable under a theory of
23  *reaspondeat superior*, and therefore, he cannot be held liable merely because of his
position as Superintendent. The fact that Mr. Keal filed grievances and wrote letters
24  does not mean that Mr. Morgan personally participated in a violation of Mr. Keal's
religious rights. In fact, the grievances referred to in Plaintiff's Second Amended
25  Complaint, ¶ 4.6, clearly indicate that Mr. Keal's grievance # 0417895 was returned
to Mr. Keal as not grievable because it was filed several months after the alleged
26  incidents. Ex. 5, att. A. Moreover, the August 26, 2004, Administrative Bulletin
written by Mr. Morgan, stating that inmates are allowed to pray in the yard or on the
27  job during breaks as long as it did not disrupt others, clearly does not violate the [sic]

28  REPORT AND RECOMMENDATION - 6

1

2

Mr. Keal's right to pray.  Ex. 7, Att. P. Because Plaintiffs have failed to state a viable claim against Richard Morgan, the claims against him must be dismissed.

3

(Dkt. # 204, page 28 and 29).  Plaintiff responds by simply restating the allegations in the complaint

4

without any further clarification or evidence.  Plaintiff may not avoid summary judgment with

5

conclusions. "The object of this provision is not to replace conclusory allegations of the complaint or

6

answer with conclusory allegations of an affidavit."  Lujan v. National Wildlife Fed, 497 U.S. 871,

7

889 (1990).  **Defendant Richard Morgan's motion for summary judgment should be**
**GRANTED.**

8

9

      4.    Sharon Morgan.

10

      The allegations against Ms. Morgan are contained in paragraph 4.22 (Dkt. # 183, page 17).

11

Ms. Morgan is the Clallam Bay Correction Center counter part of defendant Rima.  Ms Morgan is in

12

charge of administration and oversight of medical personnel at Clallam Bay.

13

      There is no allegation that Ms. Morgan provides medical treatment herself.  She is sued for

14

her role as a supervisor and for her response to grievances. A plaintiff must set forth the specific

15

factual bases upon which he claims each defendant is liable.  Aldabe v. Aldabe, 616 F.2d 1089, 1092

16

(9th Cir. 1980).  A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of

17

supervisory responsibility or position.  Monell v. New York City Dept. of Social Services, 436 U.S.

18

658, 694 n.58 (1978).  A theory of *respondeat superior* is not sufficient to state a claim under 42

19

U.S.C. § 1983.  Padway v. Palches, 665 F.2d 965 (9th Cir. 1982). Medical treatment claims against

20

this defendant fail as she cannot be sued based on her supervisor position.  **Defendant Sharon**
**Morgan's motion for summary judgment should be GRANTED.**

21

22

      5.    Sandra Carter.

23

      The allegations against defendant Carter are contained in Paragraph 4.13 of the second

24

amended complaint (Dkt. # 183, page 13 and 14). Plaintiff alleges this defendant personally denied

25

him Halal diet and that she failed to "properly release him from illegal behavior modifications which

26

denied him law library, medical treatment and denied him yard.  In addition plaintiff alleges she is

27

responsible for the operation of the facility (Dkt. # 219, page 18 citing to exhibit 13).

28

REPORT AND RECOMMENDATION - 7

The court has carefully examined plaintiff's exhibit.  The exhibit consists several Documents. Included in the exhibit are:

1       A disciplinary appeal.

2.      A letter dated September 17, 2005, where Mr. Keal complains of decision, made by others to keep him on IMS status because of his refusal to cut his dread locks, the alleged taking of a box of legal material from his cell, medical treatment and an allegation Mr. Keal was being held beyond his release date.

3.      A second appeal from a major infraction.

4.      A March 15, 2005, letter from Sandra Carter indicating Ms. Carter's belief that Mr. Keal's access to legal materials question had been resolved.

5.      An April 1, 2005, letter to Mr. Keal from Ms. Carter addressing complaint he raised regarding staff.

6.      An illegible offender complaint form.

7.      A disciplinary appeal form.

8.      A memorandum expunging an infraction.

9.      A June 3, 2005 letter from Ms. Carter explaining why other persons placed Mr. Keal in Administrative Segregation.

10.     A September 8, 2005 letter where Ms. Carter addresses several allegations regarding other peoples alleged conduct.

Nowhere in exhibit 13 do plaintiffs show any action taken by Ms. Carter that violated any right or duty owed plaintiff.  The plaintiff's exhibit establishes that this defendant is being sued based on the theory of *respondeat superior*. **Sandra Carter's motion for summary judgment should be GRANTED.**

6.      Harold Clarke.

Mr. Clarke is the Secretary of the Washington State Department of Corrections.  The allegations against him are contained in paragraph 4.1 of the second amended compliant (Dkt. # 183, page 9).  Mr. Clark is being sued in his supervisory role and not for any action he has taken against either plaintiff in this action.  This defendant is being sued based on the theory of *respondeat superior*. **Mr. Clarke's motion for summary judgment should be GRANTED.**

7.      Eldon Vail.

REPORT AND RECOMMENDATION - 8

1    The allegations against Mr. Vail are contained in paragraph 4.4 of the second amended

2    complaint (Dkt. # 183, page 10).  Plaintiffs allege Mr. Vail had the ability to remove Mr. Keal from

3    Intensive Management Status, IMS, and failed to do so.  Plaintiffs also allege this defendant

4    approved plaintiff for a nine month program in the Intensive Management Unit.

5    Defendants note Mr. Keal was referred to IMS after prison officials received information

6    indicating Mr. Keal was involved in a conspiracy to introduce drugs into the prison.  There is no

7    indication Mr. Vail made the placement decision.  Mr. Keal was expected to remain infraction free

8    while on IMS but he did not do so.  Defendants argue "[t]he fact that Mr. Vail could have

9    overridden the behavioral expectations placed on Mr. Keal in his IMS referral, based on his position

10   as deputy secretary, does not mean that Mr. Vail personally participated in the decision to place Mr.

11   Keal on IMS or keep him on IMS" (D.t. 204, page 32).

12   Defendants position is well taken.  This defendant is being sued based on the theory of

13   *respondeat superior.* **Mr. Vail's motion for summary judgment should be GRANTED.**

14       8.   Dean Mason.

15   The allegations against Mr. Mason are contained in paragraph 4.3 of the second amended

16   complaint.  Plaintiffs allege this defendant is responsible for grievance responses at level three state

17   wide, and that this defendant failed to properly investigate allegations of staff misconduct.  Thus, all

18   allegations against this defendant are based on grievance responses.

19   The United States Constitution does not mandate that prison officials allow the filing of

20   grievances or that a prison has a grievance system.  Mann v. Adams, 855 F.2d 639 (9th Cir. 1988)

21   There is no allegation that this defendant ever participated in any alleged unconstitutional activity.

22   Plaintiff has no constitutional right to a grievance process and cannot demand a response to

23   grievances that is to his satisfaction.  **Mr. Mason's motion for summary judgment should be**

24   **GRANTED**.

25   /

26   /

27

28   REPORT AND RECOMMENDATION - 9

1    C.    Halal Diet - defendants Daniel Williams, William Peck, Donald Duncan, and Steven

2    Brill.

3            Defendants Daniel Williams, William Peck, Donald Duncan, and Steven Brill are named in the

4    second amended complaint for denying Mr. Keal a Halal diet that includes meat (Dkt. # 185

5    paragraphs 4.5, 4.12, 4.26, and 4.42).

6            This court is not aware of any published precedent for the proposition that a Halal diet that

7    includes meat is mandated by the Muslim faith.  The only published Circuit opinion on point this

8    court is aware of is Williams v. Morton.  Williams v. Morton, 343 F 3d, 212 (3rd Cir. 2003).  The

9    Morton decision is not binding precedent in this Circuit as it is a Third Circuit opinion.  The Third

10   Circuit approved of the practice of providing vegetarian meals to Muslim inmates who would not eat

11   non-Halal meat.

12           The factual allegations, taken in a light most favorable to Mr. Keal, are not complicated.  Mr.

13   Keal's sincerely held religious belief mandates that he eat Halal meat, if he eats meat.  Mr. Keal was

14   denied a Halal meat diet during his incarceration at the DOC.  Instead, he received an ovo-lato diet

15   that meet his nutritional needs but does not contain meat.

16           The court has considered plaintiffs exhibits.  Plaintiff has placed no evidence before the court

17   to show eating meat is mandated by his religion at any specific meal or at every meal.  The court

18   does not consider Exhibit 41, (Dkt. # 224),  as the exhibit was not submitted timely and defendants

19   have objected to the plaintiff providing the exhibit at a procedural point where no response would be

20   allowed.  Even if the court did consider exhibit 41, the affidavit of "Masjid Al-Nur" does not support

21   plaintiff's position.  The quotations in this exhibit to the Koran mandate eating Halal, but do not

22   mandate the eating of any specific food, such as meat, at any or every meal. **Defendants Williams,**

23   **Peck, Duncan, and Brill's motion for summary judgment should be GRANTED as to this**

24   **claim.**

25   /

26   /

27   /

28   REPORT AND RECOMMENDATION - 10

1          D.      Religious sponsors, Prayer in yards and at work - defendants Daniel Williams,

2                  Richard Morgan, Sherry Hartford, Gale Munden, and Donald Duncan.

3          1.      Muslim sponsors.

4          Mr. Keal claims he was denied a Muslim sponsor.  There is nothing in the United States

5   Constitution that mandates prison officials provide clergy or sponsors for every religious group.

6   Failure to provide a sponsor does not violate any right or duty owed to plaintiff, even if sponsors for

7   other groups are provided.  Johnson-Bey v. Lane, 863 Fd 2d 1308 (7th Cir. 1988).  **Defendants**

8   **Williams, Richard Morgan, Hartford, Munden, and Duncan's motion for summary judgment**

9   **should be GRANTED as to this issue.**

10         2.      Prayer at work and in the Yard.

11         It is uncontested that on August 26, 2004, defendant Richard Morgan issued a memorandum

12  clarifying that inmates may pray in the yard or while on breaks from work as long as their activities

13  do not disturb the work place or other inmates.  Mr. Keal had sent a letter to Mr. Morgan on August

14  14, 2004 regarding religious privileges (Dkt. # 219-10, page 2).  It could easily be inferred the

15  August 26, 2004 memorandum is in response to Mr. Keal's letter, but the record is not clear.

16         Defendants show that Mr. Keal did not exhaust his administrative remedies with regard to the

17  prayer issue.  Plaintiff filed grievance number 0417895 on August 25, 2004.  Plaintiff was informed

18  his grievance was well past the time lines allowed (Dkt. # 204-4, page 25).

19         The Prison Litigation Reform Act ("PLRA") requires exhaustion of administrative remedies

20  prior to filing a complaint in federal court.  The relevant portion of the act states:

21              No action shall be brought with respect to prison conditions under section 1983 of this
                title, or any other Federal law, by a prisoner confined in any jail, prison, or other
22              correctional facility until such administrative remedies as are available are exhausted.

23  42 U.S.C. § 1997e(a).

24         Here, plaintiff filed this action while incarcerated and the act applies to him.  The United States

25  Supreme Court determined that Congress enacted the provision in order to reduce the quantity and

26  improve the quality of prisoner suits. Porter v. Nussle, 534 U.S. 516 (2002).  By mandating exhaustion,

27  Congress enabled corrections officials to address prisoner complaints internally.  Where exhaustion was

28  REPORT AND RECOMMENDATION - 11

1   once discretionary, it is now mandatory. "All 'available' remedies must now be exhausted; those

2   remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'" Porter v.

3   Nussle, 534 U.S. 516 (2002) (quoting Booth v. Churner, 532 U.S. 731, 739 (2001)). The Porter Court

4   ruled that "§ 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison

5   circumstances or occurrences." Porter, 534 U.S. at 520.

6           **Defendants Williams, Richard Morgan, Hartford, Munden, and Duncan's motion for**

7   **summary judgment should be GRANTED as to this issue and the issue DISMISSED**

8   **WITHOUT PREJUDICE.**

9           E.    Ramadan 2003 - defendant Donald Duncan.

10          In September of 2003 Mr. Keal was being housed in the Intensive Management Unit at the

11  Clallam Bay Corrections Center.  He was on no movement status because he refused to brush out or

12  remove his dreadlocks.  Plaintiff entered the Intensive Management Unit on July 23, 2003 and he

13  was ordered to remove his dreadlocks (Dkt. # 204, page 8 and 9).

14          On September 16, 2003, Mr. Keal filled out a religious preference form stating he was

15  Rastafarian (Dkt. # 204-4, page 10).  A Rastifarian would be allowed to keep dreadlocks as part of

16  his religion.

17          An inmate may change his religious preferences, but under DOC policy, he may do so only

18  once every six months (Dkt. # 204-2, Exhibit 1 paragraph 6 attachment A).  Defendants aver this

19  limitation is designed to prevent inmates from jumping from religion to religion to obtain more

20  holidays, feasts, or privileges (Dkt. # 204-2, Exhibit 1 paragraph 6 attachment A).   Plaintiff does not

21  contest defendants assertions of fact and admits he filed a religious preference form stating he was

22  Rastifarian (Dkt. # 204-4, page1).  Mr. Keal, however, admits he signed this form to confuse prison

23  officials in order to keep his dreadlocks and be removed from IMS status (Dkt. # 204-4, page 1).

24          Mr. Keal has not challenged the constitutionality of the policy limiting changing religions.

25  When Ramadan took place in 2003 plaintiff was denied sack meals as his stated religious preference

26  was Rastafarian.  Plaintiff disavowed his Muslim religion by claiming to be a devotee of another

27  religion.  Under this unique set of facts, prison officials should not be held liable for denial of sack

28  REPORT AND RECOMMENDATION - 12

meals to Mr. Keal during Ramadan 2003. **Defendant Duncan's motion for summary judgment should be GRANTED.**

      F.    <u>Ramadan 2005 - defendant Steven Brill</u>.

      The allegation against this defendant is found in paragraph 4.42 of the second amended complaint (Dkt. # 183 paragraph 4.42). Defendant's aver Mr. Keal was denied sack lunches for Ramadan in 2005 because of a miscommunication (Dkt. # 204, page 6). Defendants cite to Mr. Keals Deposition (Dkt. # 204-1, page 6 citing to (Exhibit 2, attachment, A page 96 lines 9 to 12)). This portion of the deposition was not filed.

      Plaintiff in opposing summary judgment states:

> At SCCC in 2005, Mr. Keal filled out a religious preference form in[sic] September 17, 2005 and request Ramadan on or about 9/20/05 along with kites. See (Exh # 4). Chaplin[sic] S Brill did not respond to Mr. Keal who missed 5 days of Ramadan, which is crucial in practicing the tenets of his religion and is commanded by Islam. Qur'an 2:185-187 Ramadan... It is observation mandatory for Muslims. Mr. Keal did not see Chaplin[sic] Brill until the day of Eid-al-Fitr. See (States Exh # 5, Att. A).

      Plaintiff's exhibit # 4 is a blank religious preference form and does not support his contentions. Defendants Exhibit 5 Attachment A is grievance number 523458. This exhibit addresses the Eid-Al-Fitr issue and Halal diet, but does not raise any issue regarding Ramadan 2005.

      To establish an unconstitutional burden on religion, plaintiff must show that a governmental action burdened the practice of their religion by pressuring them to commit an act forbidden by the religion or by preventing them from engaging in conduct or having religious experience which their faith mandates. <u>Brown-El v. Harris</u>, 26 F.3d 68, 69-70 (8th Cir. 1994). This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious Doctrine. <u>Werner v. McCotter</u>, 49 F.3d 1476, 1479 (10th Cir. 1995).

      Plaintiff has met this burden. Plaintiff alleges he was denied the ability to fast during Ramadan 2005 because he was not provided with sack lunches after he properly declared his religious preference and requested sack meals.

      Qualified immunity. While defendants have raised the affirmative defense of qualified immunity, they have not supplied the exhibits they rely on for the proposition that the named

REPORT AND RECOMMENDATION - 13

1    defendant could have thought his actions constitutional.  **Defendant Brill's motion for summary**

2    **judgment should be DENIED**.  **The only named defendant on this claim is Steven Brill (Dkt. #**

3    **183,  page 24, paragraph 4.42).**

4           G.      Dreadlocks - defendants Carter, Blakeman and Moore.

5           When Mr. Keal entered the IMU at the Clallam Bay Corrections Center on July 23, 2003

6    inmates in that unit were not allowed to wear their hair in braids or ties.  Dreadlocks were considered

7    braids (Dkt. # 204-1, page 9).  Defendants aver plaintiff was ordered to remove the dreadlocks.  It is

8    uncontested that plaintiff was placed on no movement status for refusing this order.  Further, it is

9    uncontested that in September of 2003 plaintiff filed a change in his religious preference and claimed

10   to be Rastafarian.  This change in religious affiliation exempted him from having to remove his

11   dreadlocks.  Thus, in applying the policy, prison officials made allowance for religious beliefs and

12   made an exception to the normal application of the policy.

13          Plaintiff contends the policy is racially discriminatory and alleges only people of African

14   decent can wear their hair in dreadlocks.  The court rejects this argument as disingenuous.  The

15   policy at issue did not allow inmates to wear braids, or ties in the hair.  Dreadlocks were considered

16   as braids (Dkt. # 204-1, pages 8 and 9).  Thus, there is nothing in the record to indicate anything

17   about the policy was racially motivated.

18          Mr. Keal does not claim any sincere religious reason for refusing to remove his dreadlocks. In

19   his pleadings and deposition he has admitted his claiming to be Rastifarian was a subterfuge (Dkt. #

20   204-4, Page 1).  Without a religious claim justifying wearing his hair in dreadlocks, this issue is

21   subject to the "reasonably related to a legitimate penological goal" test. Prison regulations that limit

22   an inmate's constitutional rights are valid if they are reasonably related to legitimate penological

23   interests.  Turner v. Safley, 482 U.S. 78, 89(1987).

24          The test has four factors.  The four factors considered are: (1) Whether the regulation is

25   rationally related to a legitimate and neutral government objective; (2) What alternative avenues remain

26   open for an inmate to exercise the right impinged upon by the regulation; (3) The impact accommodation

27   of the right will have; (4) If there are easy and obvious alternatives to the regulation that tend to show the

28   REPORT AND RECOMMENDATION - 14

1    regulation is an exaggerated response.

2          The stated objective of the regulation is to prevent hiding of contraband and facilitate searches.

3    This is a legitimate, neutral, governmental goal.  The second factor is whether alternative avenues remain

4    open to the inmate to exercise the right allegedly impinged.  Mr. Keal has failed to establish any right to

5    wear his hair in dreadlocks absent membership in a religion that mandates hair be worn in a certain

6    manner.  Further, he has failed to establish racial discrimination as the policy applies to all races.

7    Without a religious claim the factor concerning accommodation of the right is irrelevant.  The final factor

8    of the analysis is the only factor favoring Mr. Keal.  In December 2003 after Mr. Keal had been released

9    from the IMU the policy was changed to allow for visual and physical inspection of dreadlocks (Dkt. #

10   204- 6 Exhibit 6 paragraph 11).

11         Without any constitutional right to wear his hair in a certain manner plaintiff's claim fails.

12   **Defendants Carter, Blakeman, and Moore's motion for summary judgment should be**

13   **GRANTED on this issue.**

14         H.      No Movement Status - defendants Blakeman and Moore.

15         According to Mr. Keal, he was held on no movement status approximately 78 days between July

16   23, 2003, and November 19, 2003.  The undisputed reason for the no movement status was Mr. Keal's

17   refusal to remove his dreadlocks (Dkt. # 183, page 14 paragraph 4.14).  Mr. Keal alleges a separate Eight

18   Amendment violation as a result of the no movement status  (Dkt. # 183, page 14 paragraph 4.14).

19         To state a claim of cruel and unusual punishment plaintiff must satisfy two requirements:

20   First, the deprivation alleged must be, objectively, sufficiently serious.  Second, "[t]o violate the

21   Cruel and Unusual Punishment Clause, a prison official must have a `sufficiently culpable state of

22   mind' . . .. [T]hat state of mind is one of `deliberate indifference' to inmate health or safety." Farmer

23   v. Brennan, 511 U.S. 825 (1994).  The prison official will be liable only if "the official knows of and

24   disregards an excessive risk to inmate health and safety; the official must both be aware of facts from

25   which the inference could be drawn that a substantial risk of serious harm exists, and he must also

26   draw the inference." Id. at 838.

27         Denial of outside recreation to an inmate for prolonged periods of time can violate the Eighth

28   REPORT AND RECOMMENDATION - 15

1   Amendment. <u>Spain v. Procunier</u>, 600 F 2d. 189 (9th Cir. 1979).  In <u>Spain</u> inmates serving years of

2   isolation and segregation were not given outside yard.  The Ninth Circuit later held that denial of outside

3   recreation for six weeks and one half weeks could also state a claim.  <u>Lopez v Smith</u>, 203 F 3d. 1122 (9th

4   Cir. 2000).

5          Here, plaintiff was on no movement status from July 23, 2003, to August 12, 2003. This would

6   have been a total of twenty days on no movement status (Dkt. # 204-1, page 9).  He was then released

7   from the IMU for 14 days and reentered the IMU on August 26, 2003.  The first placement on no

8   movement status was of too short a duration to constitute an Eighth Amendment violation.

9          The second no movement status placement began on August 26, 2003 and would have run for

10  approximately 58 days according to Mr. Keal (Dkt. # 183, paragraph 4.14).  Actually, he was in IMU for

11  85 days on this placement, August 26, 2003 to November 19, 2003.

12         There is nothing in the record to show when Mr. Keal was removed from no movement status.

13  The record is conflicting.  Mr. Keal acknowledges he signed a religious preference form stating he was

14  Rastifarian on September 17, 2003  (Dkt. # 204-4, Page 1).  However, there is also evidence in the

15  record that as late as September 30, 2003 Mr. Blakeman was attempting to have the no movement

16  status continued for another 30 days (Dkt. # 204-6, page 13, paragraph 13).

17         On the record before the court it is impossible to determine the length of time Mr. Keal was on

18  no movement status.  Neither party addresses or briefs the issue of injury to Mr. Keal or what the

19  defendants subjective motivation for the no movement status may have been.  On this record neither

20  party is entitled to summary judgment on this issue.

21         The court has considered the affirmative defense of qualified immunity.  Government officials

22  are given qualified immunity from civil liability under § 1983 insofar as their conduct does not violate

23  clearly established statutory or constitutional rights of which a reasonable person would have

24  known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  In analyzing a qualified immunity

25  defense, the court must determine:  (1) what right has been violated;  (2) whether that right was so

26  "clearly established" at the time of the incident that a reasonable officer would have been aware of its

27  constitutionality;  and (3) whether a reasonable public officer could have believed that the alleged

28  REPORT AND RECOMMENDATION - 16

1  conduct was lawful.  See  Gabbert v. Conn, 131 F.3d 793, 799 (9th Cir.1997);  Newell v. Sauser, 79

2  F.3d 115, 117 (9th Cir.1996).   In light of the Lopez decision the court finds the defendants should have

3  been on notice they cannot deny outdoor exercise for a prolonged period of time exceeding six weeks

4  Lopez v. Smith, 203 F.3d 1122 (9th Cir. 2000).  **Defendant Blakeman and Morre's motion for**

5  **summary judgment on this issue should be DENIED.  The defendants remaining in the case**

6  **on this issue are Steve Blakeman and Bob Moore.**

7          I.      Allegations of verbal misconduct - defendants Steven Blakeman, Brain Zavodny, and

8                  Randall Judd and Steven Weed.

9          Plaintiff makes allegations that each of these named defendants made improper racial slurs or

10  made verbal threats (Dkt. # 183 paragraphs 4.14, 4.32, 4.39, and 4.15).  Allegations of this nature simply

11  fail to state a claim.  Verbal harassment or abuse is insufficient to state a constitutional deprivation.

12  Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987).  Defendants are entitled to summary

13  judgment on these claims.  **Defendants Blakeman, Zavodny, Judd, and Weed's  motion for**

14  **summary judgment should be GRANTED.**

15          J.      Access to courts - defendants, Victor Buttram, Pamela Riddle, Casey Milstead,

16                  Danny Arhens, and John Aldana.

17          In the second amended complaint, Mr. Keal alleges these defendants denied him access to

18  courts for a variety reasons (Dkt. # 183 paragraphs 4.24, 4.27, 4.28, 4.29, and 4.30).  The Supreme

19  Court has held that prisoners have a constitutional right of meaningful access to the courts premised

20  on the Due Process Clause.  Bounds v. Smith, 430 U.S. 817, 821 (1977).  Such access requires

21  prison authorities to "assist inmates in the preparation and filing of meaningful legal papers by

22  providing prisoners with adequate law libraries or adequate legal assistance from persons trained in

23  the law." Bounds, 430 U.S. at 828 (emphasis added); Storseth v. Spellman, 654 F.2d 1349, 1352

24  (9th Cir. 1981).

25          The Ninth Circuit has determined that "right of access" claims that do not allege inadequacy

26  of the law library or inadequate assistance from persons trained in the law, must allege an "actual

27  injury" to court access.  Sands v. Lewis, 886 F.2d 1166, 1171 (9th Cir. 1989).  An "actual injury"

28  REPORT AND RECOMMENDATION - 17

1   consists of some specific instance in which an inmate was actually denied access to the courts. <u>Id.</u>

2   Only if an actual injury is alleged may plaintiffs' claim survive. <u>Id.</u>

3         None of Mr. Keals allegations challenge the adequacy of the law libraries, thus, Mr. Keal

4   must show actual injury.  Plaintiff has not come forward with any instance of actual injury.

5         Mr. Keal submits two court orders as evidence of injury.  The first court order is the

6   attachment to the second amended complaint  (Dkt. # 183, Exhibit 1, (<u>Keal v. Waddington</u>, 03-CV-

7   5296FDB)).  Mr. Keal had a habeas petition dismissed without prejudice because Mr. Keal had not

8   sought leave to file a second or successive petition.  The order itself shows Mr. Keal being able to

9   file multiple motions in the case.  Mr. Keal had access to court (Dkt. # 183, Exhibit 1(Keal v.

10  Waddington 03-CV-5296FDB)).  The petition was dismissed because Mr. Keal needed leave of

11  court to file a second or successive petition, not because of any lack of Documents or action by any

12  named defendant.

13        The second Document is an order dismissing a complaint filed against Correctional Officer

14  Weed in Clallam County District Court.  The action was dismissed for failure to exhaust

15  administrative remedies and plaintiff was instructed to use the prison grievance system (Dkt. # 219-

16  16, page 7, (<u>Keal v Weed</u>, AH-318-05)).  The matter was before the court on Mr. Keals' motion for

17  a protective order.  Thus, Mr. Keal was able to file a complaint and motions.  Again, Mr. Keal fails

18  to show actual injury.

19        As Mr. Keal has failed to come forward with evidence of any actual injury, his access to

20  courts claims fail.  **Defendants Buttram, Riddle, Milstead, Arhens, and Aldana's motion for**

21  **summary judgement should be GRANTED.**

22        K.    <u>Medical claims - defendants Montoya, Joseph, Hayter, Signor, Long, and Monger.</u>

23        These defendants are the remaining defendants on plaintiff Ronald Keal's medical claims.

24  Other defendants, who acted only in a supervisory capacity, have already been addressed in this

25  Report and Recommendation.  Two other defendants, Phyllis Ellis and Heidi Mallogue, moved for

26  summary judgment separately.

27        Plaintiff raises a myriad of complaints regarding his medical care.  Issues raised include, the

28  REPORT AND RECOMMENDATION - 18

1  health care provided for allergies, headaches, neck and hip pain, hypoglycemia, blood in urine, and

2  epileptic seizures.

3      1.    Alena Montoya.

4      The allegations against Lieutenant Alena Montoya are that she denied or delayed authority

5  for medical treatment to the plaintiff when he arrived at the Washington State Penitentiary on

6  November 19 or 20, 2003, (Dkt. # 183, paragraph 4.10).  Lieutenant Montoya is a Shift Lieutenant

7  and there is no allegation that she provides medical treatment herself.  The legal face sheet for Mr.

8  Keal shows him arriving at the Penitentiary on November 20, 2003 (Dkt. # 204-4, page 20).  Plaintiff

9  alleges he had been subjected to excessive force at the Clallam Bay Correction Center three days

10  earlier, on November 17, 2003.  He alleges he requested medical personnel examine him and claims

11  he had a neck injury.  He alleges he declared a medical emergency but defendant Montoya ignored

12  him.

13      Defendant Montoya has presented her affidavit stating she did work on November 20, 2003

14  but went off duty at 12:45 P.M. (Dkt. # 205-3, pages 4 to 6).  According to the manifest, the chain

15  bus with Mr. Keal on it did not arrive until almost two hours later, approximately 3:00 P.M. (Dkt. #

16  205-3, Page 6).  She denies speaking with Mr. Keal or being aware he declared a medical emergency

17  (Dkt. # 205-3, page 4).

18      The medical record shows Mr. Keal was seen on November 17, 2003 in his Clallam Bay cell,

19  claiming there had been an emergency use of force.  Mr. Keal complained his back and neck hurt and

20  that his wrists were swollen.  The medical provider noted no visible injuries (Dkt. # 204-10 page 5).

21  Mr. Keal was seen on November 18, 2003 with the same complaints.  Medical examination disclosed

22  no swelling to his wrists and full range of motion to neck (Dkt. # 204-10, Page 5).  Mr. Keal was

23  seen on November 19, 2003 while in transit at the Washington Corrections Center (Dkt. # 204-10,

24  page 5).  No injury was noted.  Mr. Keal was seen again on November 20, 2003 at the Penitentiary

25  (Dkt. # 240-10, page 6).  No injuries were noted and prescription medication was renewed.  A

26  follow up appointment was made to determine medical needs.  Plaintiff was seen six days later, on

27  November 26, 2003, complaining of neck and back pain, x-rays were ordered (Dkt. # 204-10, page

28  REPORT AND RECOMMENDATION - 19

6).

There is no evidence to show defendant Montoya delayed or interfered with any prescribed medical treatment and, contrary to plaintiff's assertions, he was seen five times in ten days and was seen the day he arrived at the Penitentiary. **Defendant Montoya's motion for summary should be GRANTED.**

2.    Robert Monger.

The allegations against this defendant are set forth in the second amended complaint (Dkt. # 183, paragraph 4.23). Mr. Keal alleges this defendant violated his Eighth Amendment rights on March 30, 2005, by ordering restraints and a spit sock be placed on the plaintiff while he was allegedly having a grand mal seizure.

The court had considered the March 30, 2005 incident in two prior Report and Recommendations. The court addressed the use of restraints on Mr. Keal and stated:

> Mr. Keal's claims regarding use of restraints and the spit shield or spit sock being placed over his head fails. Mr. Keal fails to show the placement of these items on him caused him any harm or injury. Given medical personnel's concern or opinion that Mr. Keal may have been faking his seizure, the application of restraints prior to having non security personnel come in close contact with him was reasonable. Mr. Keal fails to show placing a spit shield or spit sock on him violated any right or duty owed to him given the allegation that Mr. Keal began spitting during his transport to the clinic. Mr. Keal has not denied or contradicted this allegation with any competent evidence.
>
> Even if the court assumes the placement of restraints and spit sock to be sufficiently serious to state a claim, Plaintiffs fail to show that any prison official drew an inference that there was substantial risk to the plaintiff. In fact, the medical providers and their expert all express the opinion that Mr. Keal was not having a grand mal seizure. Ms Mallogue states "[f]rom my experience, these are not the typical signs or symptoms of grand mal seizure activity." (Dkt. # 193, page 3).
>
> Defendants' medical expert, Dr. Doherty, states "it is not likely that Ronald Keal suffered a 'grand mal seizure' or set of seizures on March 30, 2005." (Dkt. # 195). Dr. Doherty states his opinion that the duration of the activity was too long, the fall to the ground was too "slow," there was no noticeable "tonic" or "clonic" phase to Mr. Keals alleged seizure, no loss of continence, no tongue biting, and the movements depicted on the video were not what he would expect from grand mal seizure (Dkt. # 195). Dr. Doherty also notes defendant Mallogue assessed Mr. Keal using the "ABC's Airway, Breathing, Circulation. Thus, Mr. Keals' concerns of choking on vomit were addressed in the initial examination and his airway was clear.
>
> Dr. Doherty emphasized it was rare for grand mal seizure to last more than 90 seconds and Mr. Keals' event lasted for longer than 10 minutes (Dkt. # 195). In his

REPORT AND RECOMMENDATION - 20

opinion it is "extremely common that psychogenic events and psychological nonepiliptiform events or malingering events occur for period [sic] longer than 90 seconds." (Dkt. # 195).

　　　　Defendant Ellis formed a diagnosis opinion which she memorialized the day after the event as:

EXAM:　　　Inmate was on the day room floor.  He displayed no incontinence.  Individual had not vomited. He showed no sign of 'foaming' from mouth or gaging.  He remained extremely rigid.  When asked a question or when I tried to check his pupils (open his tight shut eyes), he would rigidly posture and then wildly flail his body in an arched position for 15 to 20 seconds, and then would return to a quiet state with mild shaking.

　　　　　　Mr. Keal was bought to Medical on a litter.  He quickly stopped shaking ( within 10 to 15 minutes).  He was then placed in an observation room (which he walked to without difficulty).

　　　　　　Individual was fully alert; showed no sign of confusion and walked back to IMU without difficulty.

Diagnosis:　　Psuedoseizure/malingering.

(Dkt. # 196).

　　　　Given medical personnel's determination that plaintiff was faking his seizure, application of restraints and a spit sock did not violate Mr. Keal's rights.  **Defendant Monger's motion for summary judgment should be GRANTED.**

　　　　3.　　Remaining medical claims, defendants Joseph, Hayter, Signor and Long.

　　　　a.　　The standard of care.

　　　　The government has an obligation to provide medical care for prisoners, and the Eighth Amendment proscribes deliberate indifference to their serious medical needs.  Estelle v. Gamble, 429 U.S. 97 (1976),  Such conduct is actionable under 42 U.S.C. § 1983.  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992).

　　　　In order to establish deliberate indifference, plaintiff must show a purposeful act or failure to act on the part of the defendant.  McGuckin, at 1060.  A difference of opinion between a prisoner and medical authorities regarding proper medical treatment does not give rise to a 42 U.S.C. § 1983 claim.  Franklin v. Oregon, State Welfare Div., 662 F.2d 1337, 1344 (9th Cir. 1981).  Mere

REPORT AND RECOMMENDATION - 21

1 negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's

2 Eighth Amendment rights.  Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988). Further,

3 a prisoner can make no claim for deliberate medical indifference unless the denial was harmful.

4 McGuckin, at 1060; Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.

5 1985).

6       An Eighth Amendment Claim has two components.  The first component is the objective

7 element that the deprivation was serious.  Young v. Quinlan, 960 F.2d 351, 359 (3rd Cir. 1992).

8 The second is a subjective element--that a prison official acted with deliberate indifference.  Young,

9 960 F.2d at 359-60.

10       To constitute deliberate indifference, an official must know of and disregard an excessive risk

11 to inmate health or safety;  the official must be aware of facts from which the inference could be

12 drawn that a substantial risk of serious harm exists; and the official must also draw the inference.

13 Farmer v. Brennan, 511 U.S. 825 (1994).  **Defendants Joseph, Hayter, Signor, and Long's**

14 **motion for summary judgment should be GRANTED.**

15       b.    Hip pain.

16       Plaintiff alleges that when force was used to take him to the ground February 2, 2004, his hip

17 was injured.  He raises an Eighth Amendment claim for inadequate medical treatment.  The record

18 shows plaintiff requested medical treatment and x-rays of his hip were taken in February of 2004

19 (Dkt. # 219-5, page 4) .  When the x-ray disclosed a possible bone lesion, medical staff at the

20 Washington State Penitentiary ordered a MRI be performed at the Walla Walla General hospital.

21 The result of the MRI were normal and medical personnel determined the possible lesion was a

22 "bone island" (Dkt. # 219-5, page 4).

23       Thus, plaintiff was seen and his complaint was evaluated.  A difference of opinion between a

24 prisoner and medical authorities regarding proper medical treatment does not give rise to a section

25 1983 claim.  Franklin v. Oregon, State Welfare Div., 662 F.2d 1337, 1344 (9th Cir. 1981).

26 **Defendants Joseph, Hayter, Signor, and Long's motion for summary judgment should be**

27 **GRANTED.**

28 REPORT AND RECOMMENDATION - 22

1          c.      Allergies.

2          Plaintiff's first reported problem with allergies in prison is on March 11, 2001 (Dkt. # 219-3,

3    page 9).  Plaintiff was referred to the medical unit for treatment.  The next allergy situation was on

4    October 14, 2003, at which time defendant John Joseph performed a punch biopsy on a rash area

5    (Dkt. # 219-3, page 10).  Neither party has placed any other specific evidence or information before

6    the court.

7          Plaintiff has failed to show his condition was serious or that he was not seen and treated.

8    Further, plaintiff has shown no injury.  **Defendants Joseph, Hayter, Signor, and Long's motion**

9    **for summary judgment should be GRANTED.**

10         d.      Neck pain.

11         Plaintiff has been diagnosed with degenerative disk disease  (Dkt. # 219-5, page 2).  His first

12   complaints about neck pain were in November of 2003, according to a grievance response, he was

13   treated with medication for the pain and was referred to a Doctor for further treatment (Dkt. # 219-

14   5, page 5).  The response shows plaintiff was seen and treated.  The fact that he has a degenerative

15   condition does not equate to a finding of liability for any named defendant.

16         While plaintiff's condition requires periodic medical treatment for pain, and monitoring, the

17   record shows that has occurred.  The May 2, 2006 consultation discloses multiple x-rays have been

18   taken and there have been repeated consultations and evaluations.  Plaintiff fails to show any

19   defendant has been deliberately indifferent to his condition.  **Defendants Joseph, Hayter, Signor,**

20   **and Long's motion for summary judgment should be GRANTED.**

21         e.      Hypoglycemia.

22         Plaintiff has complained of hypoglycemia for a number of years while housed in several

23   different facilities. The exhibits presented show a few low blood sugar readings (Dkt. # 219-4).

24   Plaintiff presents exhibits showing he was allowed to have sack snacks, between dinner and breakfast

25   at every facility where he was housed except Clallam Bay (Dkt. # 217-7, pages 8 to 17).  He alleges

26   an Eighth Amendment violation for the treatment of this condition while incarcerated at the Clallam

27   Bay Corrections Center.

28   REPORT AND RECOMMENDATION - 23

1   At Clallam Bay, plaintiff was evaluated by Dr. Hopfner.  Dr. Hopfner is not a named

2   defendant in this action.  On February 9, 2005, Dr. Hopfner dictated a memo which states:

3   I did review his enormously, extensive past medical records, for evidence of
    Documented hypoglycemia.  The only record I could find for hypoglycemia was a

4   blood sugar of 52, recorded in June of 1997, one of 55 in July of 1997, and a glucose
    of 64 in 1989.  These are all done by fingerstix, and not highly reproducible such as

5   venous blood sugars.  They are also not critical values.  Furthermore, he is a very
    husky-appearing male, weighing around 200 pounds, and his request for extra food

6   would only tend to increase his obesity.  All in all, in my opinion, he does not have
    significant hypoglycemic episodes enough to justify extra food.  I believe his

7   complaints of "hypoglycemia" are attempts to manipulate the system, as well as
    myself.  He has many other blood sugars recorded in the 70s and 80s, all of which are

8   quite normal.  Followup as needed.

9   (Dkt. # 205-3, page 3).

10   Neither the treatment plaintiff received for his alleged condition, nor Clallam Bays refusal to

11   continue treatment constitutes Eighth Amendment violations.  A difference of

12   opinion between a prisoner and medical authorities regarding proper medical treatment does not give

13   rise to a 42 U.S.C. § 1983 claim.  Franklin v. Oregon, State Welfare Div., 662 F.2d 1337, 1344 (9th

14   Cir. 1981). **Defendants Joseph, Hayter, Signor, and Long's motion for summary judgment**

15   **should be GRANTED.**

16   f.   Seizures.

17   Plaintiff alleges without proof that he suffers from epileptic seizures.  He alleges an Eighth

18   Amendment violation for the treatment he has received for his condition.

19   The first reported seizure is in 2001 at the Washington State Penitentiary.  Medical personnel

20   at that facility sent plaintiff to Walla Walla General hospital for testing (Dkt. # 219-3, page 4).  A

21   127 page report on an elctroencephalogram was performed.  The test included recordings with

22   hyperventilation and post hyperventilation.  Dr. Eishier, who is not a named defendant, found no

23   evidence of seizures and concluded "[t]his does not exclude seizures but makes them unlikely to be

24   present" (Dkt. # 219-3 page 4).

25   Medical personnel have repeatedly questioned if Mr. Keal was having seizures, or if he was

26   malingering. On August 25, 2003, plaintiff declared a medical emergency.  He was treated, found to

27   be stable, and advised to keep a sick call appointment for the next day.  A later followup call

28   REPORT AND RECOMMENDATION - 24

1  revealed him to be sleeping (Dkt. # 204-1, page 11).  Mr. Keal was examined at 7 A.M. the next day,

2  August 26, 2003.  A "complete panel of laboratory tests" was ordered.  Mr. Keal was placed on

3  medical lay in.

4          Mr. Keal disregarded the medical lay-in instructions.  As a result of his failure to follow

5  instruction he was placed in a holding cell.  At 4 P.M. Medical personnel responded to an emergency

6  call in the IMU and found Mr. Keal lying on the floor of the holding cell.  After initial assessment

7  Mr. Keal was transported to the Health Care Unit.  Mr. Keal had no blood in his urine and staff

8  suspected Mr. Keal was "faking it" (Dkt. # 204-8, page 28).  The encounter report states:

9          O=    I/M found lying on back in IMU strip cell.  Breathing hard+deep.
                 Unresponsive.  Vitals taken.  Arranged to go to medical resp 52 p120 174/88
10               reg cuff.

11         S=    States he has been feeling sick for one week stated on the way to medical

12         O=    In I/M's presence asked security to transport I/M to medical to determine what
                 happened to see if I/M was in distress or 'faking it.'  I/M immediately calmed down +
13               raised head up.  He was able to state he was @ CBCC when questioned.

14     8/26/03 1605

15         O=    Vitals taken through cuff port on suicide watch. 90/48 120 98%.
                 I/M calming down.  UA obtained.  0 blood. Spec grav 1.030.  J. Joseph ARNP
16               called 0 orders received. I/M cleared to return to IMU.

17     1640 8/26/03

18         S=    I/M states his head is bleeding and requests alcohol pad.

19         O=    Blood seen on I/M's fingers.

20         P=    Will give washcloth to clean self before goes to IMU.

21         O=    I/M's eyes Very bloodshot -

22  (Dkt. # 204-8, page 28).  Mr. Keal has an abrasion to the back of his head which he was allowed to

23  clean with a wash cloth and he was returned to the IMU (Dkt. # 204-8, page 28).

24          On March 30, 2005, a medical emergency was again declared in the IMU at Clallam Bay.

25  Mr. Keal was in the day room and appeared to be having a seizure.  This incident was captured on

26  video tape and is in the record (Dkt. # 148, Exhibit 8).  Defendants Ellis and Mollague have

27  submitted separate motions for summary judgment.  Both of them have indicated the symptoms they

28  REPORT AND RECOMMENDATION - 25

1   observed on March 30, 2005, were not consistent with epileptic seizures.  The only remaining

2   defendant with regard to this issue is John Joseph.  Mr. Joseph saw Mr. Keal on March 30, 2005, in

3   the health care unit and diagnosed Mr. Keal as faking.  His dictated a memorandum to that effect and

4   his plan of action was to have Mr. Keal infracted for creating a false emergency (Dkt. # 197, Exhibit

5   1).

6       There is a disagreement between the plaintiffs and defendants regarding Mr. Keals condition

7   and the need for treatment.  This disagreement does not preclude summary judgment on an Eighth

8   Amendment claim.  A difference of opinion between a prisoner and medical authorities regarding

9   proper medical treatment does not give rise to a 42 U.S.C.§ 1983 claim.  Franklin v. Oregon, State

10  Welfare Div., 662 F.2d 1337, 1344 (9th Cir. 1981).  **Defendants Joseph, Hayter, Signor, and**

11  **Long's motion for summary judgment should be GRANTED.**

12      L.    Retaliation - defendants Blakeman, Weed, O'Neal, and Riddle.

13      To state a § 1983 claim based on retaliation, plaintiff must allege (1) the type of activity

14  engaged in was a protected right under the constitution; and (2) the State impermissibly infringed on

15  the right to engage in the protected activity.  Rizzo v. Dawson, 778 F.2d 527, 531 (9th Cir. 1985).

16  Plaintiff also must establish that the retaliatory act does not advance legitimate penological goals,

17  such as preserving institutional order and discipline.  Id.; Barnett v. Centoni, 31 F. 3d 813, 816 (9th

18  Cir. 1994).

19      Mr. Keal complains of two infractions.  The infractions arose from situations where Mr. Keal

20  filed grievances.  The grievances were investigated, and the person doing the investigation

21  determined that Mr. Keal had lied, or intentionally presented a false grievance, in order to have an

22  innocent person disciplined.  The person who did the investigation then infracted Mr. Keal for his

23  allegedly false grievances.

24      Defendant's summarize the retaliation claims as follows:

25      Mr. Keal alleges that Steven Blakeman wrote "retaliatory infractions" for grievances
26      filed by Mr. Keal, that Steve Weed subjected Mr. Keal to "an ongoing pattern or
        practice retaliatory harassment, threats, intimidation, and theft of legal Documents,"
        that Robert O'Neal "found Mr. Keal guilty of an infraction of a retaliatory nature,"
27      and that Carroll Riddle found Mr. Keal guilty of an infraction in retaliation for filing a

28  REPORT AND RECOMMENDATION - 26

1  grievance. See Plaintiffs' Second Amended Complaint ¶¶ 4.14, 4.15, 4.33, 4,34.

2  (Dkt. # 204-2, page 11).

3  Mr. Keal's retaliations claims fail.  Mr. Keal has come forward with no evidence to support

4  his claim that any action taken against him was retaliatory.  In the case of defendant Weed, Mr. Keal

5  does not allege the actions were taken as a result of Mr. Keal engaging in any protected conduct.  In

6  the case of Mr. Blakeman and Mr. Riddle, these two persons wrote infractions after investigating

7  grievances.  They determined that not only was Mr. Keal not entitled to relief under the grievance

8  system, but, that the grievances contained intentional falsehoods and were submitted for an improper

9  purpose.

10  A prisoner cannot usually be punished for using the grievance process as the prisoner is

11  exercising a First Amendment right to redress government.  However, the First Amendment does not

12  protect against baseless accusations or intentional falsehoods.  Bill Johnson's Restaurants, Inc. v.

13  N.L.R.B., 461 U.S. 731 (1983). Once the person investigating the grievance made the subjective

14  determination that Mr. Keals' accusations were baseless or intentional falsehoods, Mr. Keal lost his

15  First Amendment protections.

16  Defendants note that Lieutenant Riddle did not hear the infraction.  Lieutenant Riddle wrote

17  the infraction after determining the grievance was baseless (Dkt. # 204-2, page 12).  Infracting an

18  inmate who has filed an intentional false grievance furthers legitimate penological goals and therefore

19  is not retaliatory.  Barnett v. Centoni, 31 F. 3d 813, 816 (9th Cir. 1994). **Defendants Blakeman,**

20  **Weed, O'Neal, and Riddle's motion for summary judgment should be GRANTED.**

21  M.    Visitation - defendants Waddington, McElravy, Flemming, and Lane.

22  Mr. and Mrs. Keal lost visitation privileges as a result of alleged misconduct by Mrs. Keal at

23  the Stafford Creek Correction Center on October 8, 2005 (Dkt. # 204-1, page 23).  The only issue

24  this court considers to have merit would be a possible due process violation.  Mr. and Mrs. Keal

25  were entitled to notice and an opportunity to be heard.  The court assumes there is a liberty interest

26  in non-contact visitations.  The court notes the Supreme Court has held there is no right to contact

27  visits.  Block v. Rutherford, 468 U.S. 576 (1984).

28  REPORT AND RECOMMENDATION - 27

1    DOC policy 450.300 provides that a visitor may appeal the termination of visitation privileges
2    to the Superintendent and to the Prison Administration.  The record shows Mrs. Keal used the
3    appeal process (Dkt. # 204-8, page 17 (letter from Lynne DeLano to Mrs. Keal Dated December 14,
4    2005)).  The Keals take issue with the timing of the notice and the result of their appeal.  The
5    incident leading to the loss of visitation allegedly occurred October 8, 2005.  The decision to
6    terminate privileges was not made until October 15, 2005.  On October 15, 2005 Mrs. Keal was
7    denied visitation without prior notice.  The letter with the notice of denial and appeal process was
8    not sent until October 18, 2005 and not received until October 21, 2005 (Dkt. # 183, page 22
9    paragraph 4.37.

10    It is uncontested the Keal's were given an opportunity to be heard.  There has been no due
11    process violation.  **Defendants Waddington, McElravy, Flemming and Lane's motion for**
12    **summary judgment should be GRANTED.**

13    N.    <u>Use of force November 17, 2005 - defendant Steven Weed</u>.

14    Plaintiff alleges Correctional Officer Steven Weed used excessive force against him on
15    November 17, 2003 (Dkt # 183, paragraph 4.15).  Defendants do not address this claim in the
16    motion for summary judgment**.  Defendant Steven Weed's motion for summary judgment**
17    **should be DENIED.**

18    O.    <u>Miscellaneous</u>.

19    There are a number of defendants who have not yet specifically been mentioned in any detail.
20    They include Steve Ramsey, Brian McGarvie, Les Schneider, and Susan Winters.

21    Plaintiff's claims against these defendants fail for a number of reasons.  Claims against
22    defendants Ramsey and Winters are based in part on the position these defendants hold. (Dkt. # 183
23    paragraphs 4.2 and 4.31).  A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the
24    basis of supervisory responsibility or position.  <u>Monell v. New York City Dept. of Social Services</u>,
25    436 U.S. 658, 694 n.58 (1978).  A theory of *respondeat superior* is not sufficient to state a claim
26    under 42 U.S.C. § 1983.  <u>Padway v. Palches</u>, 665 F.2d 965 (9th Cir. 1982).

27    To the extent plaintiff alleges Mr. Ramsey or Ms. Winters played a part in placing him on
28    REPORT AND RECOMMENDATION - 28

1    IMS status or in segregation the claim also fails.  An inmate has no liberty interest in placement or

2    classification decisions.  Toussaint v McCarthy, 801 F.2d 1080 (9th Cir. 1986); Vitek v Jones, 445

3    U.S. 480 (1980); Hewitt v. Helms, 459 U.S. 460 (1983); Montanye v Haynes, 427 U.S. 236 (1976).

4    The claims against Mr. McGarvie and Mr. Schneider (Dkt. # 183, paragraphs 4.35 and 4.36) are not

5    cognizable.  Plaintiffs assertions regarding placement and classification simply fail as a matter of law.

6    There is no liberty interest in being free from administrative segregation.  Smith v. Noonan, 992 F.2d

7    940 (1990).  **Defendants Ramsey, Winters, McGarvie, and Schneider's motion for summary**

8    **judgment should be GRANTED.**

9              P.     Cross motion for summary judgment.

10             The dispositive motion cut off date in this action was November 24, 2006 (Dkt. # 86).

11   Plaintiff's cross motion for summary judgment was not filed until December 11, 2006 (Dkt. # 219).

12   While plaintiffs requested an extension of time to respond to defendants motion, they did not request

13   the court extend the deadline for filing dispositive motions (Dkt. # 215).  The cross motion will not

14   be considered and the court considers plaintiffs' filings only as a response.

15                                          CONCLUSION

16             Defendant Motion for Summary Judgment should be **GRANTED** with the following

17   exceptions:

18             1.     The denial of Ramadan sack lunches during Ramadan 2005. Remaining defendant,
                      Steven Brill. (Paragraph 4.42 of the second amended complaint).
19
20             2.     Prolonged loss of outside yard privileges.  Remaining defendants, Steven Blakeman
                      and Bob Moore (Paragraphs 4.14 and 4.25 of the second amended complaint).

21             3.     Alleged use of excessive force on November 17, 2003.  Remaining defendant Steven
                      Weed. ( Paragraph 4.15 of the second amended complaint).
22
23             In all other respects the complaint should be dismissed.  The dismissal of the right to pray in

24   the yard claims would be without prejudice, all other claims should be dismissed with prejudice.  A

     proposed order accompanies this Report and Recommendation.
25
               Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal rules of Civil
26
     Procedure, the parties shall have ten (10) days from service of this Report to file written objections.
27

28   REPORT AND RECOMMENDATION - 29

1   *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for

2   purposes of appeal.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed

3   by Rule 72(b), the clerk is directed to set the matter for consideration on **February 23, 2007**, as

4   noted in the caption.

5

6

7           DATED this 25 day of January, 2007.

8

9                                                   <u>/S/ J. Kelley Arnold</u>
                                                    J. Kelley Arnold
10                                                  United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   REPORT AND RECOMMENDATION - 30